Arliss R. **RAHE,** Plaintiff,

v.

Michael J. **ASTRUE,** Commissioner of Social Security, Defendant.

No. C11–3002–PAZ.

United States District Court, N.D. Iowa, Central Division.

Dec. 14, 2011.

David A. Scott, Cornwall Avery Bjornstad Scott, Spencer, IA, for Plaintiff.

Teresa K. Baumann, United States Attorney's Office, Cedar Rapids, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PAUL A. ZOSS, United States Chief Magistrate Judge.

### Introduction

The plaintiff, Arliss R. Rahe, seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act. 42 U.S.C. § 405(g). Rahe contends that the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that she is not disabled. For the reasons that fol-low, the Commissioner's decision is **reversed**, and this matter is **remanded** for further proceedings.

### Background

Rahe was born in 1947, completed one year of college, and previously worked as a hair dresser, general office clerk, and home health aide. AR 16, 106, 112, 117. On May 23, 2007, Rahe applied for DIB, alleging disability beginning on April 12, 2007, due to lower back and right shoulder pain. AR 8, 90–94, 106, 111. The Commissioner denied Rahe's application initially and again on reconsideration; consequently, Rahe requested a hearing before an Administrative Law Judge ("ALJ"). AR 44–57. On April 22, 2009, ALJ Thomas M. Donahue held a hearing in which Rahe testified. AR 22–43. On September 25, 2009, the ALJ issued a decision finding Rahe not disabled since the alleged onset date of disability of April 12, 2007. AR 5–21. Rahe sought review of this decision by the Appeals Council, which denied review on November 15, 2010. AR 1–4. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. § 404.981.

On January 13, 2011, Rahe filed a complaint in this court seeking review of the ALJ's decision. On February 9, 2011, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted.

### Summary of Evidence

Unless otherwise noted below, the court will review the record from Rahe's alleged onset date of disability of April 12, 2007. See Dipple v. Astrue, 601 F.3d 833, 834 (8th Cir.2010) (relevant period is from claimant's alleged disability onset date).

### A. Alexander Pruitt, M.D.

On April 17, 2007, an MRI of Rahe's lumbar spine revealed degenerative changes in the lower lumbar spine with grade I anterior spondylolisthesis of L4 on L5 and severe bilateral foraminal narrowing at L5–S1. AR 235.

On April 19, 2007, Jennifer Von Bank, a certified physician assistant at Kossuth Family Health Center, restricted Rahe to "light duty" work, with no lifting of greater than fifteen pounds and no repetitive bending, stooping, or squatting. AR 234. "DJD of LS spine." AR 234.

On May 15, 2007, X-rays of Rahe's cervical spine revealed "mild cervical spondylosis at multiple levels primarily at C5/6." AR 238. Alexander Pruitt, M.D., an orthopedist, noted that X-rays of Rahe's lumbar spine showed that "she has some degenerative spondylolisthesis at L4/5 that is just minimal. She has some degenerative changes of the facet joints at multiple levels in the lower spine. Her spine is well aligned on the AP with just the degenerative changes that we see at the facet joints at L5, S1[;] otherwise she has well maintained disc spaces throughout." AR 231–32. Dr. Pruitt's assessments included "facet arthropathy at L5, S1 bilaterally" and "hand pain with positive Tinel's in her elbow with previous carpal tunnel surgeries bilaterally with neck pain and bilateral shoulder pain." AR 232.

Rahe underwent a "technically successful" right L5–S1 epidural steroid injection. AR 237. Dr. Pruitt's note indicated "no work" until Rahe's follow-up appointment on June 7, 2007. AR 225.

On May 17, 2007, Dr. Pruitt noted that Rahe could return to work after two weeks. AR 230.

On May 24, 2007, nerve conduction studies were normal; EMG revealed no abnormalities and "no electrodiagnostic evidence of neuropathy, plexopathy, or radiculopathy involving the upper extremities." AR 229.

On May 24, 2007, Dr. Pruitt reviewed an MRI that revealed "pretty significant foraminal stenosis at L5, S1 bilaterally," but was "otherwise pretty unremarkable." AR 227.

On May 29, 2007, Rahe underwent a second lumbar epidural steroid injection. AR 226. On June 5, 2007, Rahe underwent a third lumbar epidural steroid injection. AR 224.

On June 7, 2007, Dr. Pruitt remarked in a treatment note as follows:

> We discussed doing bilateral facet injections and we also can try single nerve root injections. There are a lot of problems with her work. She works at Home Health assisting an aide, so she has to do a lot of cleaning and take care of her. They don't have light duty for her. We will leave her off of work. If they have light duty for her they will call us back. We will give the epidural a chance to work for a few weeks and if it is not much better, we will set up L5, S1 bilateral facet injections in a couple of weeks. She may have to have a surgical release also and decompression if she gets no relief.

AR 221.

On June 14, 2007, Rahe received an injection to treat her right shoulder pain. AR 220. On June 21, 2007, Rahe underwent a right L5–S1 facet injection. AR 219.

On June 27, 2007, Dr. Pruitt noted that Rahe "is currently working with a 15 pound lifting restriction, no repetitive bending, stooping or squatting." AR 217.

On July 5, 2007, Dr. Pruitt restricted Rahe's work to "no repetitive bending, lifting and twisting and no lifting greater than 20 lbs for 3 months. She will be on

light duty work and she has Home Health in [sic]." AR 259.

On August 22, 2007, Dr. Pruitt noted Rahe's twenty-pound lifting restriction. "She can do prolonged standing and prolonged walking and sitting as tolerated. She had no problems with stooping, climbing, kneeling and crawling." AR 254.

On September 26, 2007, Dr. Pruitt remarked in a treatment note as follows:

> She comes back to see us for follow up after a single nerve root injection. That was done on the 12th, CT directed left L5 selective nerve root injection done by Dr. Paul Skopec. We last saw her on the 4th of September. Most [of] her discomfort is the left leg and she said the Medrol Dosepak she said worked for four days [sic]. She had facet injections on the 21st of June. She comes back to see us to let us know how she is doing. There is severe bilateral foraminal narrowing at L5/S 1 and grade 1 anterior listhesis [sic] at L4/5. She is 60 years old.
>
> We have tried everything including single nerve root injection. She finally got some partial relief of her symptoms but she has the numbness in her foot. With her significant foraminal stenosis we tried letting her go back to work and it has not worked[;] she just gets recurrence of her symptoms. We have gotten to the point right now that we do not think surgical intervention will make her better but we have maximized all of her treatment at this point in time. I do not think she will be able to go back to doing housekeeping any more. She was doing housekeeping for home health. At this point in time I would say she is not able to return to that. We will call Social Security Disability[;] they want an update from January until now and will let them know that. She will need to be on intermittent medications and intermittent injections to relieve her pain.

Her other problem today is that she has shoulder problems. She cannot sleep on it[;] it is [bothering] her quite a bit.

AR 271, 316.

On October 3, 2007, X-rays of Rahe's left shoulder were unremarkable, with no fracture, dislocation, or other acute bony pathology identified. AR 315.

An MRI taken on October 15, 2007, revealed a "relatively unremarkable left shoulder"; "no indication of full thickness rotator cuff tear, significant tendinopathy or partial surface tear of any of the tendons comprising the rotator cuff tendon"; and "moderate left AC joint arthopathy with overgrowth." AR 312.

On November 21, 2007, Rahe reported to Dr. Pruitt that a shoulder injection on November 8 "helped a bit but it is still bothering her quite a bit." AR 304. Dr. Pruitt noted that "[s]he is doing real well. Her shoulder still bothers her a bit and her back bothers her a bit. She says all of them are tolerable at this point in time." AR 304.

On March 17, 2008, Dr. Pruitt's treatment note stated the following:

> Patient returns to our orthopaedic clinic today in follow-up of her low back pain. She has undergone 3 cortisone injections as well as a L5 left nerve root injection. Since the injections, she has not noticed any improvement of her symptoms. She has undergone physical therapy in Emmetsburg. She has had 90% improvement of her symptoms. She denies any lower leg involvement and her back pain has improved as well. She is now able to do housework without problems. She has not noticed any weakness. She denies any numbness or tingling. She is doing her home exercise program religiously and knows the importance of this as well.

. . . .

Since she is doing well, she would like to continue on conservative treatment. She will continue her home exercise program daily. She will return to work today with no restrictions. I talked to her about watching her symptoms and if they return, she will back off on her activities, but still continue her activities of daily living. She is in agreement with this plan. She received a work release today to return to work with no restrictions.

AR 300.

## B. State Agency Medical Consultants

On July 19, 2007, James Wilson, M.D., a state agency medical consultant, assessed Rahe's physical residual functional capacity ("RFC"). AR 241–48. Dr. Wilson opined that Rahe could (1) lift and/or carry 10 pounds occasionally and 10 pounds frequently; (2) stand and/or walk for a total of about six hours in an eight-hour workday; (3) sit for about six hours in an eight-hour workday; and (4) perform unlimited pushing and/or pulling with the upper and lower extremities. AR 242. Further, Rahe could occasionally climb ramps and stairs (but never ladders, ropes, or scaffolds), balance, stoop, kneel, crouch, and crawl. AR 243. Finally, Rahe had no manipulative, visual, communicative, or environmental limitations other than only occasional overhead lifting on the right and avoiding concentrated exposure to hazards. AR 244–45. Dr Wilson found that Rahe "has sought ongoing treatment for her allegations. No credibility issues are noted." AR 246.

On September 19, 2007, John May, M.D., another state agency medical consultant, opined that Rahe could (1) lift and/or carry 20 pounds occasionally and 10 pounds frequently; (2) stand and/or walk for a total of about six hours in an eight-hour workday; (3) sit for about six hours in an eight-hour workday; and (4) perform unlimited pushing and/or pulling with the upper and lower extremities. AR 263. Dr. May noted as follows:

The initial assessment [on July 19, 2007,] noted restrictions in lifting to 15 pounds occasionally and 10 pounds frequently. The treating source, however, has currently provided a statement with limitations to 20 pounds. Updated medical information has been received and reviewed. The additional information is supportive of limitations to within the light range as indicated in this assessment. With the above amendment in the exertional limitations, the remainder of the previous assessment dated 07/19/07 is affirmed as written. Further functional limitations are not supported by the totality of the [medical evidence of record] in the file.

AR 263–64.

## C. Buena Vista Regional Medical Center

On January 8, 2009, Rahe underwent a functional capacity evaluation at Buena Vista Regional Medical Center. AR 332–44. The ALJ noted in his decision the following findings from the evaluation:

At the request [of] the claimant's attorney, a functional capacity evaluation was completed by Stephanie McClellan, MA, OTR/L on January 8, 2009. The claimant reported low back pain, left leg pain from the hip to her foot, right leg pain, left shoulder pain, and bilateral hand pain. [AR 333–34.] The claimant related working part-time 15–20 hours per week involving light housekeeping tasks such as sweeping, washing dishes, laundry, dusting, and vacuuming as well as assisting patients with dressing and grooming. [AR 335.] The claimant stated she rested between tasks due to pain. [AR 335.] Examination revealed full active range of motion of the upper extremities, bilateral hip, knees, and an-

kles with only slight discomfort with hip flexion bilaterally. [AR 337.] Range of motion in the thoracic and lumbar spine was decreased. [AR 337–38.] The claimant's ability to complete fine motor/dexterity type of activities was within normal limits for work tasks and activities of daily living. [AR 341.] The claimant did not complain of diminished sensation or pain during testing. [AR 341.] The examiner found inconsistency between perceived level of function and actual physical capabilities demonstrated by low scores on the PACT Spinal Function Sort, Revised Oswestry Low Back Disability Questionnaire and the Shoulder Rating Questionnaire. [AR 336–37.] Examination and assessment included completion of the McGill Pain Questionnaire, Waddell's Inappropriate Symptoms Questionnaire, and Ransford Pain Drawing with resulting low scores indicative of possible symptom magnification. [AR 336, 342.] On the Revised Oswestry low back disability questionnaire the claimant scored in the 58% range indicating she perceived herself as severely disabled. [AR 336.] The examine[r] noted during the functional capacity evaluation the claimant demonstrated abilities higher than her perceived abilities. [AR 336.] The examiner opined the claimant would have the following restrictions: occasional stair climbing; infrequent kneeling; occasional lifting from 20 to 35 pounds depending on positioning; and occasional static, dynamic standing and walking. [AR 343–44.] The examiner recommended body mechanic education as the claimant displayed poor body mechanics during lifting, such as twisting her back and counseling to help improve the claimant's perception of her current functional abilities and possibly progress to full time employment in the future. [AR 344.]

AR 14.

### Hearing Testimony

#### A. Plaintiff's Testimony

The ALJ summarized Rahe's testimony as follows:

The claimant testified she stopped working in April 2007. She was placed on short-term disability by her employer until October 2007. She was release[d] to return to work without restrictions on March 17, 2008 by Dr. Pruitt. The claimant stated she returned to work part-time May 1, 2008 as a home health aide. She works approximately 15–16 hours per week, 3–4 hours per day 4–5 days per week.... The claimant stated she is unable to work more hours due to pain....

. . . .

The claimant alleged an inability to work due to low back pain and right shoulder pain. The claimant described pain in the low back, right leg and numbness in the left leg. The claimant most recently worked as a home health aide and stated she needs to sit down and rest between jobs. The claimant worked 32–36 hours a week prior to the alleged onset date in April 2007. She was on a leave of absence from April 20, 2007 through approximately October 2007 while on short-term disability from her employer. The claimant stated she returned to work part-time as a home health aide May 1, 2008 working approximately 15 to 16 hours per week. She usually works in the morning for 3–4 hours, 4–5 days per week depending on available jobs. The claimant stated sitting or standing too long bothers her and she will need to sit and rest or change positions. She testified she can sit 30–45 minutes before needing to

stand and move around. In addition to working part-time, the claimant described daily activities including cooking, shopping, and completing most of the household chores such [as] cleaning, laundry, and dishes. The claimant has taken Aleve and Tylenol for pain, but only takes Tylenol now because she learned Aleve can cause kidney problems. The claimant stated [her] prescribed medications caused side effects of nausea and dizziness so she quit taking them. The claimant's educational background includes one year of college and training as a hairdresser and home health aide.

AR 10–12.

## B. Post–Hearing Proceedings

A vocational expert ("VE") did not testify in person at the hearing. Rather, the ALJ submitted interrogatories after the hearing to a VE, who responded on June 9, 2009. AR 168–75. The VE identified Rahe's past relevant work as a home health aide as semi-skilled and medium,[1] her work as a general office clerk as semi-skilled as light,[2] and her work as a hair dresser as skilled and light. AR 173.

The ALJ posed the following hypothetical:

Assume that the claimant is 61 years old with a twelfth grade education, one year of completed college credits, and additional training in hair dressing in 1966 and home health care in 1998. Based on her impairments, she can lift and carry no more than twenty pounds occasionally and lift and carry no more than ten pounds frequently. She can sit and stand two hours at a time each for six hours total in an eight-hour workday. She can never climb ladders, ropes or

scaffolds; and she can occasionally stoop, kneel, crouch, and bend. She cannot work at unprotected heights or around moving and hazardous machinery. (Based on [AR 217, 253–60, 262–69]). Would the claimant, with these limitations, be capable of performing her past relevant work . . . ?

AR 169.

The VE stated that, "[w]ith these limitations the hypothetical person . . . could do the past work of a hair dresser or a general office clerk as they are light per the Dictionary of Occupational Titles (DOT) but not that of a home health aide as that is medium per the DOT." AR 173.

In response to another hypothetical by the ALJ, the VE stated that the same hypothetical person "would not be precluded from unskilled work" if she had no exertional limitations, were able to perform housework and cook meals, and her treating physician released her to return to work with no restrictions. AR 170, 174. The VE further identified light, semi-skilled jobs to which skills from Rahe's previous employment as a home health aide and general office clerk would transfer. AR 174. The VE also identified light, unskilled jobs that Rahe could perform, such as an assembler, routing clerk, and sales attendant. AR 170, 174.

On June 16, 2009, the ALJ notified Rahe's counsel by letter of possible actions to take in response to the VE's testimony, including submitting written comments concerning the VE's testimony, "a written statement as to the facts and law [the claimant believes] apply to the case in light of that evidence," or written questions to be sent to the VE. AR 176. The ALJ stated that he would enter the VE's testi-

---

1. "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

2. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

mony into the record and issue his decision if he received no response within ten days. AR 177.

On June 26, 2009, in response to the ALJ's correspondence, Rahe's counsel requested an additional thirty days to comment on the ALJ's interrogatories and the VE's responses and "to submit a written statement as to the facts and law which apply." AR 178. The ALJ did not respond to the request.

On August 6, 2009, Rahe's counsel submitted eleven interrogatories to the ALJ to be propounded on Rahe's behalf to the VE:

1. Assuming claimant's testimony that she can walk for only 1 ½ blocks without significant pain and can stand for only 10 minutes is credible, would claimant be able to perform any of her past relevant work?

2. Assuming claimant's testimony that she can walk for 1 ½ blocks without significant pain and can stand for only 10 minutes is credible, would claimant be able to perform any other work?

3. Claimant reports in Exhibit 4E [AR 124–34] that she earned $10 per hour at her job as a bookkeeper. If you divide the total earnings for her bookkeeping job as reported in Exhibit 5D [AR 100–05] for the years 1998, 1999, and 2000 it reflects she was working 7.28 hours per week in 1998, 8.7 hours per week in 1999, and 6.45 hours per week in 2000 which indicates that job was not being performed at the level of substantial gainful employment activity. Therefore, should the position of general office clerk have been considered past relevant work?

4. Assuming that the Functional Capacity Evaluation performed on January 8, 2009 (Exhibit 22F [AR 332–44]) accurately defines claimant's postural tolerances for static standing, dynamic standing, and walking as occasional (1–33% of day), could claimant perform her past relevant work as hairdresser?

5. Claimant is over age 60. Are the skills which you have identified as readily transferrable in your answer to Interrogatory No. 13 from the Administrative Law Judge skills that are readily transferrable to other work with little or no vocational adjustment?

6. Is your definition of sit/stand requirements for light work as stated in your answer to Interrogatory No. 12 from the Administrative Law Judge (sit/stand two hours at a time each for six hours total in an eight-hour workday) consistent with the definition of light work from the Dictionary of Occupational Titles Glossary Fourth Edition Revised 1991 at page 1013 which states: "a job should be rated Light Work: (1) when it requires walking or standing to a significant degree"[?]

7. Would you agree that the only job which fits the Functional Capacity Evaluation performed at Buena Vista Regional Medical Center (Exhibit 22F) is general office clerk?

8. Does the Functional Capacity Evaluation (Exhibit 22 F) describe a full range of light duty work for claimant?

9. In order to perform a full range of light duty work, would claimant be required to be on her feet for more than 2.5 hours per 8 hour work day?

10. Would you agree that the postural tolerances described on page 12 of 13 of the Functional Capacity Evaluation (Exhibit 22 F) describe no more than sedentary work activity?

11. Assuming that the Functional Capacity Evaluation performed on January 8, 2009 (Exhibit 22F) accurately defines claimant's postural tolerances for static standing, dynamic standing, and walking as occasional (1–33% of day), could claimant perform any of the occupations to which you state skills could be transferred in your answers to Interrogatory No. 14 and Interrogatory No. 16 from the Administrative Law Judge?

AR 180–81. The ALJ did not submit the interrogatories to the VE. AR 8.

### Summary of ALJ's Decision

On September 25, 2009, the ALJ found that Rahe (1) had not engaged in substantial gainful activity since the alleged onset date of disability of April 12, 2007; and (2) had an impairment or a combination of impairments considered to be "severe" on the basis of the requirements in the Code of Federal Regulations; but (3) did not have an impairment or a combination of impairments meeting or equaling one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (4) was able to perform her past relevant work as a hair dresser and general office clerk. AR 10–16. Alternatively, the ALJ found that Rahe could perform light-level work in the national economy. AR 16–17. The ALJ accordingly found that she was not disabled since April 12, 2007. AR 17.

In so finding, the ALJ found that Rahe had the following RFC:

[T]he claimant has the residual functional capacity to perform light work ... such that the individual could lift and carry no more than twenty pounds occasionally and lift and carry no more than ten pounds frequently; sit and stand two hours at a time each for six hours total in an eight-hour workday; never climb ladders, ropes or scaffolds; and occasionally stoop, kneel, crouch, and bend. The individual cannot work at unprotected heights or around moving and hazardous machinery.

AR 11.

Regarding Rahe's credibility, the ALJ found that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment." AR 14–15. In this regard, the ALJ found as follows:

At one point or another in the record, either in forms completed in connection with the application, in medical records or other statements, the claimant reported activities of daily living including preparing meals, completing household chores, laundry, and shopping, activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. As mentioned earlier, the record reflects work activity after the alleged onset date. Although that work activity may not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported. Although the claimant has received various forms of treatment including physical therapy and injections for the allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record also reveals that the treatment has been generally successful in controlling those symptoms. Despite the complaints of allegedly disabling symptoms of pain, the claimant has taken only over the counter pain medication and has not been prescribed any type of narcotics. In addition, the

claimant reported relief of pain symptoms with Aleve and Tylenol. The record reveals that the claimant reported pain symptoms to the doctor at approximately the same level of severity prior to the alleged onset date. The fact that the impairment(s) did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work. The record reflects that the claimant has made inconsistent statement(s) regarding matters relevant to the issue of disability. In March 2008, the claimant reported to both the physical therapist and the treating orthopedist very little if any pain symptoms, expressing a desire to return to work. However, a few months later, during a functional evaluation obtained by the claimant's representative in seeking disability benefits, the claimant reported severe pain in the back, legs, hips, and shoulders, contradictory to prior statements made to treating sources. The claimant admitted to certain abilities that provide support for part of the residual functional capacity conclusion in this decision. Therefore, the undersigned finds the claimant has been less than fully credible regarding her allegation of total disability.

AR 15. "Treatment records, as a whole, do not support the claimant's subjective allegations of severe and disabling pain." AR 15. "The credibility of the claimant's allegations is weakened by evidence of diverse daily activities and inconsistencies between the claimant's testimony and the medical records for the relevant period. The claimant does experience some level of pain and limitations as described in the residual functional capacity." AR 15–16.

The ALJ also weighed the opinion evidence in the record, finding as follows:

As for the opinion evidence, the undersigned has considered the opinion of Dr. Pruitt, the treating orthopedist, and great weight is afforded the opinion as it is internally consistent with treatment records and with the medical record as a whole. Furthermore, a portion of the limitations have [sic] been incorporated into the residual functional capacity assessment. The undersigned has also considered the opinion of Stephanie McClellan who, at the request of the claimant's representative, evaluated the claimant on one occasion for the purpose of performing a functional capacity evaluation. The opinion is afforded some weight as a portion of the limitations are [sic] consistent with the record as a whole. In accordance with Social Security Ruling 96–6p, the Administrative Law Judge has considered the administrative findings of fact made by State Agency medical physicians and other consultants. The opinions are weighed as statements from non-examining expert sources. Based on the evidence, the undersigned concludes the State Agency adequately considered the evidence of record and great weight is given the opinions.

AR 15. The ALJ further found that "[t]he State Agency opinions are internally consistent and consistent with the evidence as a whole." AR 15.

The ALJ also found that, "[a]lthough the representative requested additional interrogatories be submitted to the vocational expert, the interrogatories that were proposed by the undersigned are the most consistent with the medical evidence of record." AR 8.

### Disability Determinations and the Burden of Proof

The Social Security Act defines a disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of

not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists … in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue,* 500 F.3d 705, 707 (8th Cir.2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

■ Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart,* 353 F.3d 602, 605 (8th Cir.2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby,* 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

■ The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) under-

standing, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir.2007) (internal quotation marks omitted).

■ Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan,* 133 F.3d 583, 588 (8th Cir.1998).

■ Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir.2003) (internal quotation marks omit-

ted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

▉ Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at step four, age, education, and work experience. *See Bladow v. Apfel,* 205 F.3d 356, 358–59 n. 5 (8th Cir.2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart,* 390 F.3d 584, 591 (8th Cir.2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.

*Stormo v. Barnhart,* 377 F.3d 801, 806 (8th Cir.2004).

### The Substantial Evidence Standard

▉ The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards and whether the factual findings are supported by substantial evidence on the record as a whole. *Page,* 484 F.3d at 1042. This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart,* 433 F.3d 575, 577 (8th Cir.2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."). Under this standard, substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Kluesner v. Astrue,* 607 F.3d 533, 536 (8th Cir.2010); *see Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

▉ Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that supports the Commissioner's decision as well as the evidence that detracts from it." *Kluesner,* 607 F.3d at 536 (quoting *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir.2008)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart,* 349 F.3d 549, 555 (8th Cir.2003) (citing *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir.1991)).

▉ In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any

contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir.1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin,* 349 F.3d at 555 (citing *Bates v. Chater,* 54 F.3d 529, 532 (8th Cir.1995)), or "review the factual record de novo." *Roe v. Chater,* 92 F.3d 672, 675 (8th Cir.1996) (citing *Naber v. Shalala,* 22 F.3d 186, 188 (8th Cir.1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner,* 607 F.3d at 536 (quoting *Finch,* 547 F.3d at 935). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994) (quoting *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir.1984); *see Goff v. Barnhart,* 421 F.3d 785, 789 (8th Cir.2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

### Discussion

Rahe contends that the court should reverse the ALJ's decision because (1) the ALJ failed to give proper weight to Dr. Pruitt's medical findings; (2) a preponderance of the medical evidence of record compels a finding that she is disabled and entitled to receive benefits, and the record does not contain substantial evidence in the record as a whole to support the ALJ's decision; and (3) she was denied the opportunity of a full and fair hearing because the VE's testimony "was allowed to go unchallenged" because her proposed interrogatories were not propounded to the VE by the ALJ. Doc. No. 12 at 8–9. The Commissioner maintains that (1) the ALJ properly assessed the credibility of Rahe's subjective allegations; (2) the ALJ properly weighed the medical opinions; (3) Rahe had a fair hearing and received due process; and (4) substantial evidence supports the ALJ's determination at step five.

### A. The ALJ's Determination of Plaintiff's Credibility

As the Commissioner points out, Rahe does not contest the ALJ's credibility finding. Doc. No. 14 at 10. Nevertheless, the court addresses the ALJ's determination of Rahe's credibility below.

▮▮▮▮ "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari,* 274 F.3d 1211, 1218 (8th Cir.2001). Accordingly, the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart,* 393 F.3d 798, 801 (8th Cir.2005). In this regard, an ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole. *Id.* When evaluating a claimant's subjective complaints, the ALJ must consider 1) the claimant's daily activities; 2) the duration, frequency and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984); *see* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii) (codifying *Polaski* factors). Other factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints. *Wildman v. Astrue,* 596 F.3d 959, 968 (8th Cir.2010). Thus, although an ALJ

may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence, *Halverson v. Astrue*, 600 F.3d 922, 931–32 (8th Cir.2010), such evidence is one factor that the ALJ may consider. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir.2008); *see Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir.2010) (noting that an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary). Further, an ALJ need not explicitly discuss each *Polaski* factor; it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints. *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir.2009); *see Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir.2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").

In assessing Rahe's credibility, the ALJ first acknowledged the above factors. AR 11 (citing 20 C.F.R. § 404.1529 and Social Security Ruling 96–7p). The ALJ then pointed to the lack of objective medical evidence in discounting Rahe's subjective complaints. AR 12–15.

 The ALJ found that Rahe's activities of daily living belied her claim of disability. AR 15. Inconsistencies between subjective complaints of pain and daily living patterns may diminish credibility. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir.2007). In particular, "acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir.2009); *see also Tippie v. Astrue*, 791 F.Supp.2d 638, 651–52 (N.D.Iowa 2011) (collecting cases). On the other hand, a claimant need not prove he is bedridden or completely helpless to

be found disabled. *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir.2005). Rather, "[i]n evaluating a claimant's RFC, consideration should be given to the quality of the daily activities and the ability to sustain activities, interests, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities must also be considered." *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir.2007).

 In this case, substantial evidence in the record of Rahe's reported activities supports the adverse credibility determination of the ALJ, who found that Rahe "reported activities of daily living including preparing meals, completing household chores, laundry, and shopping, activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." AR 15. Although a claimant need not be bedridden before he can be determined to be disabled, Rahe's "daily activities can nonetheless be seen as inconsistent with [her] subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints." *Teague v. Astrue*, No. 4:09CV948MLM, 2010 WL 2653472, at *8 (E.D.Mo. June 29, 2010) (collecting cases), *aff'd*, 638 F.3d 611 (8th Cir.2011).

 Furthermore, the ALJ found that, "[a]lthough the claimant has received various forms of treatment including physical therapy and injections for the allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record also reveals that the treatment has been generally successful in controlling those symptoms." AR 15. A claimant's improvement following treatment is a valid reason to discount the claimant's subjective complaints. *See Johnson v. Astrue*, 628 F.3d 991, 995–96 (8th Cir.2011) (treating physicians' reports that claimant was "doing well" were inconsistent with levels

of pain and fatigue claimant described at hearing, which justified ALJ's discounting of claimant's subjective complaints of disabling pain); *Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir.1999) ("Impairments that are controllable or amenable to treatment do not support a finding of total disability."); *Jenkins v. Chater*, 76 F.3d 231, 233 (8th Cir.1996) (claimant's reported improvement with treatment was proper basis to discount subjective complaints).

The ALJ further found that, "[d]espite the complaints of allegedly disabling symptoms of pain, the claimant has taken only over the counter pain medication and has not been prescribed any type of narcotics. In addition, the claimant reported relief of pain symptoms with Aleve and Tylenol." AR 15. "Conservative treatment of pain through over-the-counter medication and limited use of prescription medication can be inconsistent with a claimant's allegations of disabling pain." *Sangel v. Astrue*, 785 F.Supp.2d 757, 776–77 (N.D.Iowa 2011) (citing *Moore v. Astrue*, 572 F.3d 520, 524–25 (8th Cir.2009); *Clevenger v. Soc. Sec. Admin.*, 567 F.3d 971, 976 (8th Cir.2009)).

The ALJ also found Rahe to be less than fully credible because the record reflected work activity after the alleged onset date, although that activity did not rise to the level of substantial gainful activity (AR 15). *See Medhaug*, 578 F.3d at 816 (holding that, in discounting claimant's credibility, ALJ properly considered each of claimant's employment positions maintained after alleged onset date of disability).

Finally, the ALJ found that Rahe made inconsistent statements "regarding matters relevant to the issue of disability." AR 15. The ALJ noted that, in March 2008, "the claimant reported to both the physical therapist and the treating orthopedist very little if any pain symptoms, expressing a desire to return to work. However, a few months later, during a functional evaluation obtained by the claimant's representative in seeking disability benefits, the claimant reported severe pain in the back, legs, hips, and shoulders, contradictory to prior statements made to treating sources." AR 15. Because "[t]he ALJ may discredit a claimant based on inconsistencies in the evidence," the ALJ appropriately discounted Rahe's credibility on the basis of her inconsistent statements in the record. *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir.2011).

In sum, substantial evidence in the record as a whole supports the ALJ's discounting of Rahe's credibility.

## B. *Procedural Due Process*

Rahe argues that the ALJ's failure to propound her eleven proposed interrogatories to the VE denied her the opportunity of a full and fair hearing. Doc. No. 12 at 9. The Commissioner maintains that, in fact, "[t]he record demonstrates that [Rahe] had a full and fair hearing and received full due process through the Social Security administrative process, including the opportunity to propound interrogatories to the vocational expert." Doc. No. 14 at 17. Rahe "was given the opportunity to challenge the vocational expert's responses, but counsel waived those opportunities both expressly and through untimely submissions." *Id.* at 18. The Commissioner further contends that, because due process does not afford claimants an absolute right to cross-examine individuals who submit a report, "it was within the ALJ's discretion not to submit [Rahe's] untimely additional interrogatories." *Id.*

In reply, Rahe asserts that "[t]he ALJ did not decline to submit [her] interrogatories because they were untimely, but because he thought they were not sufficiently 'consistent with the medical evidence of record.'" Doc. No. 16 at 1 (citing AR 8). According to Rahe, "[s]uch concerns

should have been addressed in the ALJ's decision, after the expert answered the questions, instead of censoring the questions before they were asked. The ALJ abused his discretion in failing to submit these interrogatories." *Id.* at 1–2.

 "Procedural due process under the Fifth Amendment requires that disability claimants be provided a full and fair hearing. Social security disability hearings are non-adversarial proceedings and therefore do not require full courtroom procedures." *Passmore v. Astrue,* 533 F.3d 658, 663–64 (8th Cir.2008) (footnote, citation, and internal quotation marks omitted). A determination of a claimant's claim "requires that he have the opportunity to present all of his evidence and to confront the evidence against him. This opportunity ... is present where cross-examination is available where reasonably necessary to the full development of the case." *Flatford v. Chater,* 93 F.3d 1296, 1306–07 (6th Cir.1996).

 On the other hand, "due process does not afford social security claimants an absolute right to cross-examine individuals who submit a report." *Passmore,* 533 F.3d at 665.

> Due process requires that a claimant be given the opportunity to cross-examine and subpoena the individuals who submit reports. The ALJ, however, is not required to inform the claimant's attorney that the claimant has a right to cross-examine the vocational expert. The ALJ is required to allow the claimant to cross-examine the witness, but if the claimant's attorney fails to object to the post-hearing reports or remains silent when the opportunity to request cross-examination arises, the right to cross-examination is waived.

*Coffin v. Sullivan,* 895 F.2d 1206, 1212 (8th Cir.1990) (citations omitted).

The Commissioner contends that Rahe waived the opportunity to challenge the VE's responses because her interrogatories to the VE were untimely, despite the ALJ's notice. Doc. No. 14 at 18. The Commissioner further maintains that it was within the ALJ's discretion not to submit Rahe's additional interrogatories to the VE because the ALJ concluded that they were not consistent with the medical evidence. *Id.* (citing AR 8). The court disagrees.

 The court finds that, by refusing to submit Rahe's additional interrogatories to the VE, the ALJ denied Rahe the opportunity to confront the evidence against her. Rahe has not waived her right to submit the interrogatories. Rather than remaining silent or failing to object, she informed the ALJ on June 26, 2009, that she needed an additional thirty days to comment on the VE's responses to the ALJ's interrogatories. *See Wallace v. Bowen,* 869 F.2d 187, 194 (3d Cir.1988) (by stating to ALJ that he had "not had the opportunity to confront these physicians and challenge their conclusions," claimant's attorney objected to post-hearing reports and did not waive right to cross-examination); *cf. Coffin,* 895 F.2d at 1213 (claimant waived right to cross-examination of VE by not responding or objecting to proposed and answered interrogatories); *Hudson v. Heckler,* 755 F.2d 781, 784–85 (11th Cir. 1985) (per curiam) (claimant's legal representative did not respond to opportunity to cross-examine author of post-hearing report and thus waived right to do so). The ALJ simply ignored this request. On September 25, 2009, almost two months after Rahe submitted her interrogatories to the ALJ, the ALJ issued his decision denying her application for DIB. In his decision, the ALJ did not even mention the timeliness of Rahe's interrogatories, but found only that the ALJ's interrogatories "are the most consistent with the medical evidence of record." AR 8. In light of these facts, the court finds that Rahe did not waive her right to cross-examine the VE.

Because Rahe's interrogatories to the VE were reasonably necessary to the full development of her case, this case is remanded so that the ALJ may forward the interrogatories to the VE and conduct further proceedings as necessary. *See Townley v. Heckler,* 748 F.2d 109, 114 (2d Cir.1984) (holding that ALJ's use of post-hearing vocational report as primary evidence upon which to deny benefits without affording claimant right to cross-examine and to present rebuttal evidence violated claimant's due process rights; "[a]lthough the ALJ asked [the claimant's] attorney to submit objections and additions to the interrogatories posed to the vocational expert, there is no evidence that the attorney's suggestions were ever forwarded").[3]

### Conclusion

For the reasons discussed above, the court finds that the Commissioner's decision is neither supported by substantial evidence in the record as a whole nor based on proper legal standards. Accordingly, the Commissioner's decision is **reversed,** and this matter is **remanded** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the above opinion. Judgment will be entered in favor of Rahe and against the Commissioner.

**IT IS SO ORDERED.**

---

**3.** Without citing any authority, Rahe also asserts that the ALJ "failed to give proper weight to the medical findings of Dr. Pruitt." Doc. No. 12 at 8. As the Commissioner points out, however, the ALJ gave "great weight" to his opinion, "as it is internally consistent with treatment records and with the medical record as a whole" (AR 15). *See Teague v. Astrue,* 638 F.3d 611, 615 (8th Cir.2011) ("A treating physician's opinion is generally given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotation marks omitted)). Accordingly, Rahe's contention lacks merit. *See also Blakley v. Schlumberger Tech. Corp.,* 648 F.3d 921, 932 (8th Cir.2011) (failing to provide legal support for assertion waives issue).